In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 14-2058 & 14-2059

RUTHELLE FRANK, *et al.*,

*Plaintiffs-Appellees*,

*v.*

SCOTT WALKER, Governor of Wisconsin, *et al.*,

*Defendants-Appellants*.

---

LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC) OF WISCONSIN, *et al.*,

*Plaintiffs-Appellees*,

*v.*

DAVID G. DEININGER, Member, Government Accountability Board, *et al.*,

*Defendants-Appellants*.

---

On Suggestion of Rehearing En Banc.

---

DECIDED OCTOBER 10, 2014

---

A judge in active service requested a vote on the question whether to rehear this appeal en banc. Chief Judge Wood and Judges Posner, Rovner, Williams, and Hamilton voted in favor of rehearing en banc. The proposal to rehear this case en banc therefore fails by an equally divided court.

This order does not affect the ability of any party to seek rehearing by the panel or the full court, see Fed. R. App. P. 35, nor does it affect the time available for filing a petition, see Fed. R. App. P. 40.

POSNER, *Circuit Judge*, joined by *Chief Judge* WOOD and *Circuit Judges* ROVNER, WILLIAMS, and HAMILTON, dissenting from denial of rehearing en banc.

The *Practitioner's Handbook for Appeals to the United States Court of Appeals for the Seventh Circuit* 161 (2014), states that "en banc rehearing is authorized without a party's invitation. A member of the court may ask for a vote on whether to rehear a case en banc." I asked for a vote on whether to rehear these appeals en banc. The judges have voted, the vote was a 5 to 5 tie, and as a result rehearing en banc has been denied. We—the five who voted to grant rehearing en banc—believe that the decision to allow the panel's opinion (reported at 2014 WL 4966557 (Oct. 6, 2014)) reversing the district court to stand, without consideration of the case by the full court, is a serious mistake.

The movement in a number of states including Wisconsin to require voters to prove eligibility by presenting a photo of themselves when they try to vote has placed an undue burden on the right to vote, a right that the Supreme Court has found latent in the Constitution. E.g., *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). The photo identification voting laws also raise issues under section 2 of the Voting Rights Act, 42 U.S.C. § 1973(a), which forbids electoral laws, practices, or structures that, interacting with social and historical conditions, deny or abridge, on account of race or color, a citizen's right to vote. See, e.g., *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

In upholding the Wisconsin photo ID law in the face of compelling evidence that it abridges the right to vote without justification, the panel opinion places particular weight

on the Supreme Court's decision in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008). Affirming a decision by this court, see 472 F.3d 949 (7th Cir. 2007), the Supreme Court upheld an Indiana law requiring photo identification of voters. The panel calls Wisconsin's law "similar." It would be more accurate to say that the laws belong to the same genre, namely strict photo ID voter eligibility laws. The two states' laws are importantly dissimilar, not only in their terms but in the evidentiary records of the two cases. Although in *Crawford* as in this case the record contained no evidence of in-person voter impersonation at polling places "actually occurring in Indiana at any time," there had been scattered instances of such fraud in recent American elections. 553 U.S. at 195–96. And there was no evidence that the Indiana law was likely to disenfranchise more than a handful of voters. Given the record, the Supreme Court was unwilling "to perform a unique balancing analysis that looks specifically at a small number of voters who may experience a special burden under the statute and weights their burdens against the State's broad interests in protecting election integrity," especially since "on the basis of the evidence in the record it is not possible to quantify either the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified." *Id*. at 200. Judge Evans, dissenting from our decision in *Crawford*, called the Indiana law "a not-too-thinly-veiled attempt to discourage election-day turnout by certain folks believed to skew Democratic." 472 F.3d at 954. But he cited no evidence to support his conjecture—a conjecture that now seems prescient, however.

*Crawford* was decided by the Supreme Court almost six and a half years ago, on the basis of the evidence presented

in that case and the particulars of the Indiana statute. The decision does not resolve the present case, which involves a different statute and has a different record and arises against a background of a changed political culture in the United States. It is a disservice to a court to apply its precedents to dissimilar circumstances. *Crawford* dealt with a particular statute and a particular evidentiary record. The statute at issue in this case has different terms and the case challenging it a different record, the terms and the record having been unknown to either our court (affirmed by the Supreme Court in *Crawford*) or the Supreme Court.

The panel opinion recognizes that there are differences between the two statutes and the two records, but does not recognize the significance of the differences. The Indiana statute challenged in *Crawford* was less restrictive than the Wisconsin statute challenged in this case. Indiana accepts any Indiana or U.S. government-issued ID that includes name, photo, and expiration date. Wisconsin's statute permits voters to use only a Wisconsin drivers' license or Wisconsin state card, a military or tribal ID card, a passport, a naturalization certificate if issued within two years, a student ID (so long as it contains the student's signature, the card's expiration date, and proof that the student really is enrolled in a school), or an unexpired receipt from a drivers' license/ID application. Wisconsin does not recognize military veteran IDs, student ID cards without a signature, and other government-issued IDs that satisfy Indiana's criteria.

Indiana's statute does not require absentee voters to present photo identification, and permits voters to vote absentee if they expect to be absent from their district on election day, are older than 65, can't vote in person because of illness or

injury or are caring for someone with an illness or an injury, are scheduled to work during the 12-hour period in which the polls are open, are members of the military, are celebrating a religious holiday, or are in the state's "address confidentiality" program (victims of domestic violence, for example). Thus, many people who might find it difficult to obtain photo identification can vote absentee and are therefore excused from having to present a photo ID. Wisconsin, in contrast, requires absentee voters to submit a photo ID the first time they request an absentee ballot, and in subsequent elections as well if they change their address or are required to re-register to vote, or if they change their name, as many women still do upon marrying. A recent national survey found that

> millions of American citizens do not have readily available documentary proof of citizenship. Many more—primarily women---do not have proof of citizenship with their current name. The survey also showed that millions of American citizens do not have government-issued photo identification, such as a driver's license or passport. Finally, the survey demonstrated that certain groups—primarily poor, elderly, and minority citizens—are less likely to possess these forms of documentation than the general population.

Brennan Center for Justice, "Citizens Without Proof: A Survey of Americans' Possession of Documentary Proof of Citizenship and Photo Identification," www.brennancenter.org/ sites/default/files/legacy/d/download_file_39242.pdf (visited October 8, 2014, as were the other websites cited in this opinion).

Wisconsin's statutory exceptions to the requirement that one must have a photo ID to be permitted to vote, which are

more limited than those recognized by the Indiana law, include members of the military, overseas voters who have no intention of ever returning to live in the United States, participants in the state's confidentiality program, and voters who being infirm or disabled are indefinitely confined to their homes or to care facilities.

The Indiana statute permits voters without a photo ID to cast a provisional ballot and within ten days after the election present a photo ID to a circuit court clerk's office; indigent voters unable to procure a photo ID by that deadline can, by executing an affidavit confirming their identity and indigence, have their ballots counted. Wisconsin has no provision for indigent voters. It does permit voters to cast a provisional ballot and later supply a photo ID, but requires that they do so by the Friday after the election, which gives them just three days to comply in national elections, since such elections are always held on Tuesdays.

These are not trivial differences between the two statutes.

The panel opinion cites the recommendation of the Commission on Federal Election Reform, *Building Confidence in U.S. Elections* 18 (2005), that photo IDs be required for voting, but omits the Commission's statement that they "should be easily available and issued free of charge," *id.* at 19, and its recommendation that states should "play an affirmative role in reaching out to non-drivers by providing more offices, including mobile ones, to … provide photo IDs free of charge," and allow "voters who do not have a photo ID during a transitional period [to] receive a provisional ballot that would be counted if their signature is verified." *Id.* at iv.

I turn now to the evidence in the respective cases. In our *Crawford* opinion we pointed out that none of the plaintiffs claimed that they wouldn't vote in the upcoming election because of the photo ID law. "No doubt there are at least a few such people in Indiana, but the inability of the sponsors of this litigation to find any such person to join as a plaintiff suggests that the motivation for the suit is simply that the law may require the Democratic party … to work harder to get every last one of their supporters to the polls." 472 F.2d at 952; see also the Supreme Court's plurality opinion, 533 U.S. at 187. In the present case, in contrast, eight persons testified that they want to vote in the November 4 election but have been unable to obtain the required identification. In *Crawford* it was estimated that about 43,000 Indiana residents lacked the requisite identification, which was 1 percent of the state's voting population, while in this case the district court found that 300,000 registered voters—9 percent of all registered voters in Wisconsin—lack qualifying identification. Many of them also lack the documents they'd need in order to obtain a photo ID, or face other impediments to getting one but are not within the narrow band of voters excused from having to present a photo ID when voting. According to an expert witness, at least 20,162 eligible voters in Milwaukee County alone possess neither a photo ID nor the documents they would need to obtain one. And in the district court's words a "substantial number of the 300,000 plus eligible voters who lack a photo ID are low-income individuals … who have encountered obstacles that have prevented or deterred them from obtaining a photo ID."

The panel was literally correct that the district court "did not find that substantial numbers of persons eligible to vote have tried to get a photo ID but been unable to do so," but its

literalism missed the point. To encounter "obstacles that have prevented or deterred" persons from obtaining a photo ID means either having tried but failed to obtain a photo ID or having realized that (for these persons) the obstacles to obtaining it were insurmountable, so there would be no point in trying to overcome them.

The district court's opinion presented a litany of the practical obstacles that many Wisconsinites (particularly members of racial and linguistic minorities) face in obtaining a photo ID if they need one in order to be able to vote because they don't have a driver's license:

> The first obstacle to obtaining an ID will be to identify the requirements for obtaining a free state ID card. I am able to summarize the requirements for obtaining an ID because I have access to the Wisconsin Statutes and Administrative Code and heard testimony on the topic at trial. A typical voter who needs an ID, however, must educate him or herself on these requirements in some other way. Although this may be easy for some, for others, especially those with lower levels of education, it will be harder. Moreover, a person who needs to obtain one or more of the required documents to obtain an ID, such as a birth certificate, must determine not only the DMV's documentation requirements, but also the requirements of the agency that issues the missing document. This adds a layer of complexity to the process. …

> Assuming the person is able to determine what he or she needs to do to obtain an ID, the person must next consider the time and effort involved in actually obtaining the ID. This will involve at least one trip to the DMV [Department of Motor Vehi-

cles]. There are 92 DMV service centers in the state. All but two of these close before 5:00 p.m. and only one is open on weekends. So, it is likely that the person will have to take time off from work. The person will either need to use vacation time if it's available or forego the hourly wages that he or she could have earned in the time it takes to obtain the ID. … The person will also have to arrange for transportation. Since this person does not have a driver's license and is low income, most likely he or she must use public transportation or arrange for another form of transportation. … Further, for some individuals public transportation will be of no help because not all of the DMV's service centers are accessible by public transit.

If the person does not have all of the documents the DMV requires to obtain an ID, then the person will most likely have to visit at least one government agency in addition to the DMV. If that is the case, then the person will likely have to take even more time off of work and pay additional transportation costs. … Perhaps it is possible for a person to obtain a missing underlying document by mail, but even so that will require time and effort.

A person who needs to obtain a missing underlying document is also likely to have to pay a fee for the document. For some low-income individuals, it will be difficult to pay even $20.00 for a birth certificate. …

An additional problem is whether a person who lacks an ID can obtain one in time to use it to vote. For many who need an ID, it will take longer than a day or two to gather the necessary documents and make a trip to the DMV. Indeed, if a per-

son needs to obtain a birth certificate, especially from another state, it might take weeks or longer to obtain it. If an election is imminent, a person may be unable to procure an ID in time to vote or to validate a provisional ballot by the Friday after the election.

Another problem that arises is a person's having errors or discrepancies in the documents needed to obtain an ID. For example, the DMV requires the name on a person's social security card and birth certificate to match. If there is an error in a person's social security record, the person must visit the Social Security Office and correct the record. If there is an error in a person's birth certificate, the person must get it amended. Making additional trips to government agencies to resolve discrepancies will require more time off work and additional transportation costs.

*Frank v. Walker*, 2014 WL 1775432, at *14–16 (E.D. Wis. Apr. 29, 2014) (citations and footnotes omitted).

In upholding the Indiana statute, both our *Crawford* opinion and the Supreme Court's plurality opinion noted that Indiana voter rolls were substantially inflated—they contained 1.3 million more names than there were eligible voters. The Supreme Court also cited a report by the Commission on Federal Election Reform which stated that although "there is no evidence of extensive fraud in U.S. elections or of multiple voting … both occur, and it could affect the outcome of a close election. … Photo [identification cards] currently are needed to board a plane, enter federal buildings, and cash a check. Voting is equally important." 553 U.S. at 194. (We'll see, by the way, that the Commission's statement that "photo

[identification cards] currently are needed to board a plane, enter federal buildings, and cash a check" is for the most part no longer true.)

There is no evidence that Wisconsin's voter rolls are inflated, as were Indiana's—and there is compelling evidence that voter-impersonation fraud is essentially nonexistent in Wisconsin. "The [state] could not point to a single instance of known voter impersonation occurring in Wisconsin at any time in the recent past." *Frank v. Walker*, *supra*, at *6. There are more than 660,000 eligible voters in Milwaukee County. According to the state's own evidence, in only one or two instances per major election in which a voter in Milwaukee County is turned away from the polls because a poll worker tells him he's voted already is there even a suspicion—unconfirmed—of fraud. An expert witness who studied Wisconsin elections that took place in 2004, 2008, 2010, and 2012 found zero cases of in-person voter-impersonation fraud.

It is important to bear in mind that requiring a photo ID is ineffectual against other forms of voter fraud, of which there are many. Here is a nonexhaustive list (from Voter Fraud Facts, "Types of Voter Fraud," http://voterfraudfacts.com/typesofvoterfraud.php (emphases omitted)):

> Electorate Manipulation Including Manipulation of Demography and Disenfranchisement;
>
> Intimidation Including Violence or the Threat of Violence, Attacks on Polling Places, Legal Threats and Economic Threats;
>
> Vote Buying**;**
>
> Misinformation;
>
> Misleading or Confusing Ballot Papers;

> Ballot Stuffing;
>
> Misrecording of Votes;
>
> Misuse of Proxy Votes;
>
> Destruction or Invalidation of Ballots;
>
> Tampering with Electronic Voting Machine.

Voter-impersonation fraud may be a subset of "Misinformation." If so, it is by all accounts a tiny subset, a tiny problem, and a mere fig leaf for efforts to disenfranchise voters likely to vote for the political party that does not control the state government. Those of us who live in Illinois are familiar with a variety of voting frauds, and no one would deny the propriety of the law's trying to stamp out such frauds. The one form of voter fraud known to be too rare to justify limiting voters' ability to vote by requiring them to present a photo ID at the polling place is in-person voter impersonation.

The panel opinion states that requiring a photo ID might at least prevent persons who "are too young or are not citizens" from voting. Not so. State-issued IDs are available to noncitizens, Wis. Adm. Code § Trans. 102.15(2)(bm)—all that's required is proof of "legal presence in the United States"; a noncitizen who is a permanent resident of the United States needs only a copy of his foreign passport and appropriate immigration documents to obtain a photo ID. A student ID must (to entitle the bearer to vote) be accompanied by proof of enrollment and contain the student's signature and date of issuance, but need not include date of birth. Wis. Stat. § 5.02(6m)(f).

Another erroneous statement in the panel opinion is that requiring a photo ID could help "promote[] accurate record-

keeping (so that people who have moved after the date of registration do not vote in the wrong precinct)." Wisconsin's photo ID law has nothing to do with voting in the correct precinct. According to testimony by the director and general counsel of the Wisconsin Government Accountability Board, the address on a voter's ID does not have to match his or her voting address.

We can learn something both about the significance of voter-impersonation fraud and the likely motivation for the Wisconsin statute from a report by the National Conference of State Legislatures, *Voter Identification Requirements | Voter ID Laws*, www.ncsl.org/research/elections-and-campaigns/voter-id.aspx. The report was issued on September 12th of this year and thus covers all requirements applicable to the forthcoming November election.

We learn from the report that 32 states require voters to present some form of identification at the polling station but that of these only 17 require photo identification. The other 15 usually will accept a utility bill, a non-photo ID, or some other document that includes the voter's name and address. The 32 states also differ in the strictness with which the identification requirement is enforced. The report classifies as "strict" those 12 states, including Wisconsin, that require the voter to show identification before a ballot will be counted at the polling place, or to cast a provisional ballot and take additional steps, such as presenting acceptable ID at a board of elections office within a specified period after election day.

According to the report, only 9 states, including Wisconsin, impose strict photo identification requirements. The other states permit at least some voters to cast a ballot without necessarily requiring any further action on the part of the

voter after election day for a vote to be counted. Instead, these states may, for example, require the voter to sign an affidavit, or a poll worker to vouch for the voter.

The data are summarized in the following table and map.

TABLE 1

| Voter Identification Laws in Force in 2014 | | | | |
|---|---|---|---|---|
| | Photo ID | | Non-Photo ID | |
| Strict | Arkansas  Tennessee  Georgia  Texas  Indiana  Virginia  Kansas  **Wisconsin**  Mississippi | | Arizona  North Dakota  Ohio | |
| Non-Strict | Alabama  Louisiana  Florida  Michigan  Hawaii  Rhode Island  Idaho  South Dakota | | Alaska  Montana  Colorado  New Hampshire  Connecticut  Oklahoma  Delaware  South Carolina  Kentucky  Utah  Missouri  Washington | |



| | | | | |
|---|---|---|---|---|
| Strict Photo ID | Strict Non-Photo ID | Photo ID requested | ID requested; photo not required | No document required to vote |

All the strict photo ID states are politically conservative, at least at the state level, as are five of the eight non-strict photo ID states (all but Hawaii, Michigan, and Rhode Island). Table 2 provides specifics on the political makeup of the governments of the nine strict photo ID states at the time their photo ID laws were enacted.

## TABLE 2

### STATES WITH STRICT PHOTO ID LAWS—POLITICAL MAKEUP WHEN THE LAWS WERE ADOPTED

**Arkansas:** Democratic governor, but both the House and Senate were under Republican control.

**Georgia:** Republican governor, Republican control of both the House and Senate.

**Indiana:** Republican governor, Republican control of both the House and Senate.

**Kansas:** Republican governor, Republican control of both the House and Senate.

**Mississippi:** Adopted by the voters through a ballot initiative. Republicans, who already controlled the governorship and the state Senate, won a majority of seats in the House in that same election.

**Tennessee:** Republican governor, Republican control of both the House and Senate.

**Texas:** Republican governor, Republican control of both the House and Senate.

**Virginia:** Republican governor, Republican control of both the House and Senate.

**Wisconsin:** Republican governor, Republican control of both the House and Senate.

The basic pattern holds for the three strict non-photo ID states. Arizona adopted such a law by initiative in 2004, at a time when the state had a Democratic governor but the Republicans controlled both houses of the state legislature (as they have between 1993 and 2013, except for a brief period between 2001 and 2002 when the senate was evenly divided). Both North Dakota and Ohio had Republican governors, and Republicans controlled both houses of the legislatures, when those states' strict ID statutes were enacted.

The 12 non-strict non-photo ID states are also predominantly conservative; only 4 are liberal (Connecticut, Delaware, New Hampshire, and Washington). Of the 18 states that don't require identification, about half are liberal.

The data imply that a number of conservative states try to make it difficult for people who are outside the mainstream, whether because of poverty or race or problems with the English language, or who are unlikely to have a driver's license or feel comfortable dealing with officialdom, to vote, and that liberal states try to make it easy for such people to vote because if they do vote they are likely to vote for Democratic candidates. Were matters as simple as this there would no compelling reason for judicial intervention; it would be politics as usual. But actually there's an asymmetry. There is evidence both that voter-impersonation fraud is extremely rare and that photo ID requirements for voting, especially of the strict variety found in Wisconsin, are likely to discourage voting. This implies that the net effect of such requirements is to impede voting by people easily discouraged from voting, most of whom probably lean Democratic.

Some of the "evidence" of voter-impersonation fraud is downright goofy, if not paranoid, such as the nonexistent buses that according to the "True the Vote" movement transport foreigners and reservation Indians to polling places. See Stephanie Saul, "Looking, Very Closely, for Voter Fraud: Conservative Groups Focus on Registration in Swing States," Sept. 16, 2012, www.nytimes.com/2012/09/17/us/politics/groups-like-true-the-vote-are-looking-very-closely-for-voter-fraud.html?pagewanted=all&_r=0. Even Fox News, whose passion for conservative causes has never been questioned, acknowledges that "Voter ID Laws Target Rarely Oc-

curring Voter Fraud," Sept. 24, 2011, www.foxnews.com/ politics/2011/09/24/voter-id-laws-target-rarely-occurring-vot er-fraud, noting that "even supporters of the new [photo ID] laws are hard pressed to come up with large numbers of cases in which someone tried to vote under a false identify."

Elsewhere we learn that "even though voter identification laws were being touted as necessary to prevent in-person voter fraud, repeated investigations of these allegations show that there is virtually no in-person voter fraud nationally. A study of 2,068 alleged cases conducted by the News21 journalism consortium found that since 2000 there have been only ten cases of in-person voter fraud that could have been prevented by photo ID laws. Out of 146 million registered voters, this is a ratio of one case of voter fraud for every 14.6 million eligible voters—more than a dozen times less likely than being struck by lightning." Richard Sobel, "The High Cost of 'Free' Photo Voter Identification Cards" 7 (Charles Hamilton Houston Institute for Race & Justice, Harvard Law School, June 2014), www.charleshamiltonhouston. org/wp-content/uploads/2014/08/FullReportVoterIDJune201 4.pdf (footnotes omitted).

And think: voting is a low-reward activity for any given individual, for he or she knows that elections are not decided by one vote. When the rewards for an activity are low, even a modest cost of engaging in it is a potent discourager. Think too of the risks to politicians of orchestrating a massive campaign of voter-impersonation fraud, since only a massive campaign will increase a candidate's vote total by enough to swing all but the very closest elections, and massive election fraud could result in heavy punishment of the orchestrators. Besides the risks to the politicians, think of how much it

would cost to orchestrate an effective voter-impersonation fraud, given the number of voters who must be bribed, and in amounts generous enough to overcome their fear of being detected, and if detected prosecuted.

M.V. Hood III and William Gillespie, in their article "They Just Do Not Vote Like They Used To: A Methodology to Empirically Assess Election Fraud," 93 *Social Sci. Q.* 76 (2012), find that "after examining approximately 2.1 million votes cast during the 2006 general election in Georgia, we find no evidence that election fraud was committed under the auspices of deceased registrants." Co-author Hood was the State of Wisconsin's expert witness in the present case—and testified that Georgia's voter ID law indeed "had the effect of suppressing turnout."

Keith G. Bentele and Erin E. O'Brien, in their article "Jim Crow 2.0? Why States Consider and Adopt Restrictive Voter Access Policies," 11 *Perspectives on Politics* 1088 (2013), present evidence that restrictive voter access policies such as photo ID requirements are indeed, as we noted earlier, highly correlated with a state's having a Republican governor and Republican control of the legislature and appear to be aimed at limiting voting by minorities, particularly blacks. And Lorraine C. Minnite, in her book *The Myth of Voter Fraud* (2010), bases her conclusion that voter-impersonation fraud is rare on the small number of federal criminal prosecutions for election fraud, despite evidence that such crimes have been an enforcement priority for the Justice Department, and on an investigation of complaints of election fraud in four states (California, Minnesota, New Hampshire, and Oregon), finding that few of the complaints involved voter impersonation.

Consider now the other side of the balance—the effect of strict voter ID laws on lawful turnout. The panel opinion does not discuss the cost of obtaining a photo ID. It assumes the cost is negligible. That's an easy assumption for federal judges to make, since we are given photo IDs by court security free of charge. And we have upper-middle-class salaries. Not everyone is so fortunate. It's been found that "the expenses [of obtaining a photo ID] for documentation, travel, and waiting time are significant—especially for minority groups and low-income voters—typically ranging from about $75 to $175. … Even when adjusted for inflation, these figures represent substantially greater costs than the $1.50 poll tax outlawed by the 24th amendment in 1964." Sobel, *supra*, at 2.

The panel opinion suggests that obtaining a photo ID to vote can't be a big deal, because one needs a photo ID to fly. That's a common misconception. See Transportation Security Administration, *Acceptable IDs*, www.tsa.gov/traveler-inform ation/acceptable-ids. Since, despite the 9/11 attacks that killed thousands, a photo ID is not considered essential to airline safety, it seems beyond odd that it should be considered essential to electoral validity.

The panel piles error on error by stating that "photo ID is essential [not only] to board an airplane … [but also to] pick up a prescription at a pharmacy, open a bank account…, , buy a gun, or enter a courthouse to serve as a juror or watch the argument of this appeal." In 35 states, including Wisconsin, you don't need a photo ID to pick up all prescriptions. Centers for Disease Control and Prevention, *Law: Requiring Patient Identification Before Dispensing*, www. cdc.gov/homeandrecreationalsafety/Poisoning/laws/id_req.h

tml. Bank customers do not need a photo ID to open a bank account. U.S. Dept. of the Treasury, Office of the Comptroller of the Currency, *Answers & Solutions; Answers About Identification*, www.helpwithmybank.gov/get-answers/bank-accounts/identification/faq-bank-accounts-identification-02.html. Federal law does not require a photo ID to purchase firearms at gun shows, flea markets, or online. U.S. Dept. of Justice, Office of the Inspector General, *Review of ATF's Project Gunrunner* 10 (Nov. 2010), www.justice.gov/oig/reports/ATF/e1101.pdf. It's true that our courthouse requires a photo ID to enter, but the Supreme Court requires no identification at all of visitors.

The panel does say, in the same paragraph of its opinion, that it "accept[s] the district court's finding [that 300,000 registered voters lack acceptable photo ID in Wisconsin] in this case," but coming after a recitation that mistakenly implies that one can do virtually nothing in this society without a photo ID, the implication is that those 300,000 have only themselves to blame for not being allowed to vote.

Robert S. Erikson & Lorraine C. Minnite, "Modeling Problems in the Voter Identification—Voter Turnout Debate," 8 *Election L.J.* 85, 98 (2009), notes that "recent research … strongly suggests that strict voter ID laws will negatively affect certain voters, including minorities, at least in the short-run," though the authors acknowledge doubt about the statistical robustness of the evidence. A study by R. Michael Alvarez, Delia Bailey, and Johnathan N. Katz, entitled "The Effect of Voter Identification Laws on Turnout," California Institute of Technology, Social Science Working Paper 1267R (Jan. 2008), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1084598, finds that "the strictest forms of voter identifi-

cation requirements—combination requirements of present-ing an identification card and positively matching one's sig-nature with a signature either on file or on the identification card, as well as requirements to show picture identifica-tion—have a negative impact on the participation of regis-tered voters relative to the weakest requirement, stating one's name. We also find evidence that the stricter voter identification requirements depress turnout to a greater ex-tent for less educated and lower income populations, for both minorities and non-minorities."

The aggregate effect of strict voter identification re-quirements in depressing turnout does not appear to be huge—it has been estimated as deterring or disqualifying 2 percent of otherwise eligible voters (Nate Silver, "Measuring the Effects of Voter Identification Laws," *N.Y. Times*, July 15, 2012, http://fivethirtyeight.blogs.nytimes.com/2012/07/15/measuring-the-effects-of-voter-identification-laws/). But obvi-ously the effect, if felt mainly by persons inclined to favor one party (the Democratic Party, favored by the low-income and minority groups whose members are most likely to have difficulty obtaining a photo ID), can be decisive in close elec-tions. The effects on turnout are bound to vary, however, from state to state, depending on the strictness of a state's ID requirements for voting and the percentage of the state's population that lacks the required ID. Remember that at the time of the *Crawford* case only 43,000 Indiana residents lacked the required identification; 330,000 registered Wiscon-sin voters lack it—and Wisconsin has a smaller population (5.7 million versus Indiana's 6.5 million). Hence the effects of the photo ID requirement on voter suppression are likely to be much greater in Wisconsin, especially since as we saw earlier its law is stricter than Indiana's.

Stephen Ansolabehere & Nathaniel Persily, "Vote Fraud in the Eye of the Beholder: The Role of Public Opinion in the Challenge to Voter Identification Requirements," 121 *Harv. L. Rev.* 1727 (2008), finds that perceptions of voter-impersonation fraud are unrelated to the strictness of a state's voter ID law. This suggests that these laws do not reduce such fraud, for if they did one would expect perceptions of its prevalence to change. The study also undermines the suggestion in the panel's opinion (offered without supporting evidence) that requiring a photo ID in order to be allowed to vote increases voters' confidence in the honesty of the election, and thus increases turnout. If perceptions of the prevalence of voter-impersonation fraud are unaffected by the strictness of a state's photo ID laws, neither will confidence in the honesty of elections rise, for it would rise only if voters were persuaded that such laws reduce the incidence of such fraud.

The panel opinion dismisses the Absolabehere and Persily article on the ground that because it was published in the *Harvard Law Review*, it was not peer-reviewed. So much for law reviews. (And what about Supreme Court opinions? They're not peer-reviewed either.) Persily, incidentally, was chosen to be Research Director for the Presidential Commission on Election Administration, a nonpartisan body co-chaired by the former counsel to Governor Romney's, and the former counsel to President Obama's, 2012 presidential election campaigns.

The studies we've cited and the evidentiary record compiled in the district court show that Wisconsin is wise not to argue that voter-impersonation fraud is common in its state. Instead it argues that such fraud is uncommon because it's

deterred by the statutory requirement of having a photo ID to be permitted to vote. But were it true that requiring a photo ID is necessary to deter voter-impersonation fraud, then such fraud would be common—maybe rampant—in states that do not require a photo ID. A glance back at Table 1 will reveal that 12 states do not require a photo ID or any strict non-photo substitute. If Wisconsin's deterrence rationale is sound, we should expect voter-impersonation fraud to be common in those states. Wisconsin does not argue that, and we know of no evidence that it could produce in support of such an argument. Nor does it argue that there is something special about Wisconsin—some unusual compulsion to engage in voter-impersonation fraud in the absence of strict photo ID requirements—that would make the experience in the 12 non-strict non-photo ID states irrelevant to the likely effect of the Wisconsin law in deterring (or rather not deterring) voter-impersonation fraud.

Despite the absence of any evidence that voter-impersonation fraud is an actual rather than an invented problem, whether in Wisconsin or elsewhere in the United States, the panel opinion contends that requiring a photo ID for eligibility to vote increases "public confidence in the electoral system." The emphasis it places on this contention suggests serious doubt by the panel members that the photo ID law actually reduces voter impersonation. But there is no evidence that such laws promote public confidence in the electoral system either. Were there such evidence it would imply a massive public misunderstanding, since requiring a photo ID in order to be permitted to vote appears to have no effect on election fraud.

The panel is not troubled by the absence of evidence. It deems the supposed beneficial effect of photo ID requirements on public confidence in the electoral system "'a legislative fact'—a proposition about the state of the world," and asserts that "on matters of legislative fact, courts accept the findings of legislatures and judges of the lower courts must accept findings by the Supreme Court." In so saying, the panel conjures up a fact-free cocoon in which to lodge the federal judiciary. As there is no evidence that voter-impersonation fraud is a problem, how can the fact that a legislature says it's a problem turn it into one? If the Wisconsin legislature says witches are a problem, shall Wisconsin courts be permitted to conduct witch trials? If the Supreme Court once thought that requiring photo identification increases public confidence in elections, and experience and academic study since shows that the Court was mistaken, do we do a favor to the Court—do we increase public confidence in elections—by making the mistake a premise of our decision? Pressed to its logical extreme the panel's interpretation of and deference to legislative facts would require upholding a photo ID voter law even if it were uncontested that the law eliminated no fraud but did depress turnout significantly.

The concept of a legislative fact comes into its own when there is no reason to believe that certain facts pertinent to a case vary from locality to locality, or from person to person; a typical definition of legislative facts is broad, general facts that are not unique to a particular case and provide therefore an appropriate basis for legislation of general application. For example, black lung disease (pneumoconiosis) is either a progressive disease, like asbestosis, or it is not. Nothing sup-

ports the idea that it is progressive for Miner A and halts for Miner B.

Even legislative facts are not sacrosanct, though "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley*, 444 U.S. 93, 111 (1979). And anyway voter fraud, voter habits, voter disenfranchisement are not legislative facts, owing to the great variance across and even within states in the administration of elections. Some states have small enough populations, or at least some of their voting precincts have small enough populations, that poll workers are likely to know personally every voter who shows up at the polls to vote. No one is going to tell the poll worker that he or she is someone else, because it would be pointless. Other states, or areas, are populous, urban, and impersonal. The poll workers in a precinct in Manhattan probably have never laid eyes on most of the voters who show up at election time. The likelihood of other forms of voter fraud similarly depends on how a locality conducts its elections. We learned (if we didn't already know) at the time of *Bush v. Gore* that every locality in the country conducts elections in its own way—voting machines, paper ballots, computer punchcards, whatever—a situation unsuited to the application of the concept of legislative fact.

The panel says that "after a majority of the Supreme Court has concluded that photo ID requirements promote confidence, a single district judge [in fact every federal judge other than at least five Supreme Court Justices *en bloc*] cannot say as a 'fact' that they do not, even if 20 political scientists disagree with the Supreme Court." Does the Supreme Court

*really* want the lower courts to throw a cloak of infallibility around its factual errors of yore? Shall it be said of judges as it was said of the Bourbon kings of France that they learned nothing and forgot nothing?

The panel opinion mentions none of the pertinent academic and journalistic literature, except the Ansolabehere and Persily article, which it disdains. Nor does the opinion acknowledge that voting is a low-reward activity, as evidenced by the fact that turnout tends to be low. The panel opinion states that "if photo ID is available to people willing to scrounge up a birth certificate and stand in line at the office that issues driver's licenses, then all we know from the fact that a particular person lacks a photo ID is that he was unwilling to invest the necessary time." But that ignores Sobel's study, discussed earlier, and the broader point that time is cost. The author of this dissenting opinion has never seen his birth certificate and does not know how he would go about "scrounging" it up. Nor does he enjoy waiting in line at motor vehicle bureaus. There is only one motivation for imposing burdens on voting that are ostensibly designed to discourage voter-impersonation fraud, if there is no actual danger of such fraud, and that is to discourage voting by persons likely to vote against the party responsible for imposing the burdens.

The panel opinion bolsters its suggestion that "scrounging" up a birth certificate is no big deal by stating that six voter witnesses in the district court "did not testify that they had tried to get [a copy of their birth certificate], let alone that they had tried but failed." That's another error by the panel, for five of these witnesses testified that they *had* tried, but had failed, to obtain a copy of their birth certificate in or-

der to be able to obtain a photo ID to be able to vote, and the sixth (who died shortly before the trial) had repeatedly but unsuccessfully tried to obtain a copy of her birth certificate. Illustrative is the testimony of one of the six that she had tried to get a voter ID in 2005 but was told she could not without a birth certificate. She was given a form to send to Mississippi, where she had been born, to request a copy of her birth certificate. She received a response two weeks later that "there was no such person"—she hadn't been born in a hospital and so there was no record of her birth. She is registered to vote, has worked as a poll worker, and had voted in the 2012 election.

A community organizer testified that she had tried to help another one of the witnesses obtain a copy of his birth certificate so that he could obtain a photo ID. He had been born in Milwaukee, but the vital-records office had no record of his birth and asked him for additional documentation, including elementary school records—which he did not have, unsurprisingly since he is 86. He had voted in previous elections but will be unable to vote in the forthcoming November 4 election. The testimony of the other witnesses was similar.

Any reader of this opinion who remains unconvinced that scrounging for one's birth certificate can be an ordeal is referred to the Appendix at the end of this opinion for disillusionment.

The panel opinion notes that 22 percent of eligible voters in Wisconsin don't register to vote, and infers from this—since registration is not burdensome (you don't need to present a photo ID in order to register)—that the 22 percent simply aren't interested in voting. Fair enough. But the panel

further infers that the 9 percent of registered voters who don't have photo IDs must likewise be uninterested in voting, since they are unwilling to go to the trouble of getting a photo ID. Wrong. The correct inference from the fact that *registered* voters lack photo IDs is the opposite of the panel's assertion that their failure to vote proves them to be uninterested in voting. Why would they have bothered to register if they didn't want to vote? Something must have happened to deter them from obtaining the photo ID that they would need in order to be permitted to vote: the inconvenience, for some registered voters the great difficulty, of obtaining a photo ID.

A remarkably revelatory article by Edwin Meese III and J. Kenneth Blackwell, entitled "Holder's Legacy of Racial Politics," *Wall Street Journal*, Sept. 29, 2014, p. A19, defends the photo ID movement as necessary to prevent voter impersonation encouraged by Democratic politicians. Yet the article states that in Texas the adoption of a photo-ID law increased turnout in counties dominated by minorities and that minority participation in Indiana rose after its photo-ID law upheld in *Crawford* went into effect. The article further states that in Georgia there was a *big* positive effect on black voting after that state's photo-ID law went into effect. The authors' overall assessment is that "voter-ID laws don't disenfranchise minorities or reduce minority voting, *and in many instances enhance it*" (emphasis added). In other words, the authors believe that the net effect of these laws is to increase minority voting. Yet if that is true, the opposition to these laws by liberal groups is senseless. If photo ID laws increase minority voting, liberals should rejoice in the laws and conservatives deplore them. Yet it is conservatives who support them and liberals who oppose them. Unless conservatives

and liberals are masochists, promoting laws that hurt them, these laws must suppress minority voting and the question then becomes whether there are offsetting social benefits— the evidence is that there are not.

To conclude, the case against a law requiring a photo ID as a condition of a registered voter's being permitted to vote that is as strict as Wisconsin's law is compelling. The law should be invalidated; at the very least, with the court split evenly in so important a case and the panel opinion so riven with weaknesses, the case should be reheard en banc.

# APPENDIX: SCROUNGING FOR YOUR BIRTH CERTIFICATE

# IN WISCONSIN



Scott Walker
Governor

Dennis G. Smith
Secretary

**State of Wisconsin**

Department of Health Services

DIVISION OF PUBLIC HEALTH
STATE VITAL RECORDS OFFICE

1 WEST WILSON STREET, ROOM 158
P O BOX 309
MADISON .WI 53701-0309

608-266-1373
FAX: 608-255-2035
dhs.wi.gov/VitalRecords

TO:            Ms. Nancy Lea Wilde
               ████ Airport St.
               Schofield, WI 54476.

FROM:          **Mark Alfred**
               **Customer and Special Services Supervisor**
               **Vital Records**
DATE:          **March 13th, 2012.**

Dear Ms. Wilde,

I received your letter requesting that we complete the DMV Form MV3002 entitled "Name and Birth Date Certification" in order for you to obtain a state ID card. The State Vital Records office is the only office that can certify that no record exists. You will need to complete an application for a Birth Record with the appropriate fee and we will send you a "Not Found "letter if necessary.

If you are absolutely certain that you do not have a birth record then I have enclosed the necessary documents and procedures to obtain a Delayed Birth Registration document. With this document your birth date is actually be recorded and it is a certified document indicating that there is a record of your birth.

I have also enclosed my business card if you need to contact me or you have any questions.
Thank you.
Sincerely,

Mark Alfred
State Vital Records Office
Division of Public Health.
608-266-0330.



STATE OF WISCONSIN
DEPARTMENT OF HEALTH SERVICES

**MARK ALFRED**
SUPERVISOR
CUSTOMER & SPECIAL SERVICES UNIT
STATE VITAL RECORDS OFFICE
DIVISION OF PUBLIC HEALTH

TELEPHONE: (608) 266-0330
E-MAIL: mark.alfred@dhs.wisconsin.gov
FAX: (608) 255-0355

ONE WEST WILSON STREET, ROOM 158
P.O. BOX 309
MADISON, WISCONSIN 53701-0309
dhs.wisconsin.gov/vitalrecords/

Case 2:11-cv-01128-LA    Filed 04/23/12    Page 2 of 13    Document 59-1

DEPARTMENT OF HEALTH AND FAMILY SERVICES
Division of Public Health
F-05201 (Rev. 02/12)

STATE OF WISCONSIN
Chapter 69.14, Wis. Stats.

## DOCUMENTARY EVIDENCE REQUIREMENTS FOR DELAYED BIRTH REGISTRATION FOR PERSONS AGE 7 YEARS OR OLDER AT THE TIME OF FILING IN VITAL RECORDS

**PENALTIES:** Any person who willfully and knowingly supplies any false information in the preparation or amendment of a birth certificate is guilty of a Class I felony and shall be fined not more than $10,000 or imprisoned for not more than 3 years and 6 months, or both, per s. 69.24(1), Wis. Stats.

In order to file a Delayed Birth Registration, Wisconsin law requires the registrant (the child) or the registrant's parent or legal guardian to present documentary evidence to prove the facts of the birth. The evidence requirements are explained below.

### SECTION I – EVIDENCE REQUIREMENTS

1. Wisconsin law requires that the following items (facts of birth) must be documented by evidence:
   - The full name of the registrant;
   - The date of birth;
   - The place of birth (there MUST be direct evidence to show the birth occurred in Wisconsin);
   - The full maiden name of the mother, and;
   - The full name of the father, unless the mother and father were not married.

2. If the registrant is AGE SEVEN OR OLDER at the time the Delayed Birth Registration is filed in Vital Records, **three** pieces of documentary evidence are required to support the facts of birth.

3. Any document presented as evidence, except for an Affidavit of Personal Knowledge (form F-05006), must have been established at least 10 years prior to filing the Delayed Birth Registration in Vital Records, OR prior to the registrant's tenth birthday.

4. At least one piece of evidence must be from early childhood, prior to the registrant's tenth birthday.

5. Only one piece of evidence may be an Affidavit of Personal Knowledge (form F-05006).

6. No piece of evidence may be from the same source as any other piece of evidence.

7. You cannot create a piece of documentary evidence for the purpose of filing a Delayed Birth Registration document.

### SECTION II – SUGGESTED DOCUMENTS

1. Form F-05018, Certification of Birth Facts for Delayed Birth Registration from Baptismal Record: This form **must** be completed by the current pastor of the church where the baptism occurred. If the Registrant was baptized, this form may be used.

2. Form F-05019, Certification of Birth Facts for Delayed Birth Registration from Physician, Hospital, School, Census, Clinic, Nursery, etc.: This form **must** be completed by the custodian of the original record. If the registrant was born in a hospital, was registered on the Census, was enrolled in school or day care, or was examined by a doctor, this form may be used.

3. Form F-05006, Affidavit of Personal Knowledge of a Birth for Delayed Birth Registration: Only one affidavit of personal knowledge may be submitted as evidence. This form **must** be completed by a person at least ten years older than the registrant and who has personal knowledge of the facts of birth, preferably a parent of the registrant.

4. Vital Records: If the registrant was married in Wisconsin or has children born in Wisconsin, the vital records filed in our office may be used as evidence of some facts of birth. List the marriage and birth information on the back of form F-05010, Application for Delayed Birth Registration. If the registrant was married or has children born in another state, you may present as evidence certified copies of the vital records purchased from the state where the event occurred.

5. Social Security Administration Numident: If the registrant has a Social Security Number, a numident printout is available from any Social Security Administration office. You must present the original printout received from the Social Security Administration. For more information, contact the Social Security Administration at (800) 772-1213.

   Our office has the ability to request a numident printout directly from the Social Security Administration (SSA) without cost. If you would like to have our office request a numident printout from SSA for you, please complete Section III, question 5 on the Application for Delayed Birth Registration (F-05010).

6. U.S. Census Report: A blank application form is enclosed. You must present the original document received from the U.S. Census Bureau.

7. Military Discharge: You must present a certified copy received from a county register of deeds or the Wisconsin Department of Veterans Affairs.

Nos. 14-2058 & 14-2059

DEPARTMENT OF HEALTH AND FAMILY SERVICES                                      STATE OF WISCONSIN
Division of Public Health                                                     Chapter 69.14, Wis. Stats.
DPH 5010 (Rev. 04/05)                                                         Page 1 of 2

## APPLICATION FOR DELAYED BIRTH REGISTRATION

### (This is a two-page form. Print back to back.)

Personally identifiable information requested on this form will be used to process your request to file a Delayed Birth Registration.
Failure to supply this information may result in denial of your request.

**Call (608) 267-0914 if you have questions regarding the completion of this form.**

PENALITIES: Any person who willfully and knowingly supplies false information in the preparation of or application for a birth certificate is guilty of a Class I felony [a fine of not more than $10,000 or imprisonment of not more than three years and six months, or both, per Chapter 69.24(1), Wis. Stats.].

---

**THE APPLICANT MUST BE THE SUBJECT OF THE BIRTH RECORD (REGISTRANT) OR A PARENT OR LEGAL GUARDIAN OF THE REGISTRANT.**

---

Type or print in BLACK INK.
Do NOT use cross-outs, write-overs, erasures, correction tape, or correction fluid. If a mistake is made, prepare another form.

### SECTION I - FACTS OF BIRTH

**1. BIRTH NAME OF REGISTRANT**

| First | Middle | Birth Last Name |
|---|---|---|
| | | |

**2. SEX**

☐ Male  ☐ Female

**3. DATE OF BIRTH**

| Month | Day | Year |
|---|---|---|
| | | |

**4. PLACE OF BIRTH** (Check either "Hospital" or "Home" and provide the appropriate information.)

| ☐ Hospital or ☐ Birthing Ctr. | Name of Facility | City, Village or Township | County | State |
|---|---|---|---|---|
| ☐ Home | City, Village or Township | County | | State |

**5. FATHER'S FULL BIRTH NAME**

| First | Middle | Birth Last Name |
|---|---|---|
| | | |

**6. MOTHER'S FULL BIRTH NAME**

| First | Middle | Birth Last Name |
|---|---|---|
| | | |

**7. WERE PARENTS MARRIED TO EACH OTHER AT THE TIME OF THIS BIRTH?**

☐ Yes  ☐ No

---

### SECTION II - NOTARIZATION

I, the undersigned, under penalty of perjury, declare that the above information and statements are true and correct, to the best of my knowledge and belief.

**CERTIFICATION OF NOTARY PUBLIC**

NOTARY SEAL

Subscribed and sworn before me this _____ day

of _____, _____.
             Month                    Year

_____ , Notary
SIGNATURE - Notary Public

of _____ County, State of _____

My commission expires _____ .
                              (Month / Day / Year)

_____
NAME OF NOTARY - Typed or Printed

**APPLICANT INFORMATION**

_____
NAME OF APPLICANT - Typed or Printed

_____
RELATIONSHIP TO REGISTRANT

_____
STREET ADDRESS

_____
CITY, VILLAGE OR TOWNSHIP        STATE    ZIP CODE

(_____) _____    _____
TELEPHONE NUMBER             DATE SIGNED

_____
SIGNATURE - Applicant

SECTION III - ADDITIONAL SUPPORTING EVIDENCE

1. If the Registrant was born in a hospital or a birthing center, submit form DPH 5019 or a letter from the hospital stating that it does not have a record of the birth and complete the following:

| NAME OF HOSPITAL OR BIRTHING CENTER |
| --- |
|  |

| LOCATION OF HOSPITAL/BIRTHING CENTER - City, Village or Township | LOCATION OF HOSPITAL/BIRTHING CENTER - County |
| --- | --- |
|  |  |

2. If the Registrant was baptized, submit form DPH 5018 and complete the following:

| NAME OF CHURCH |
| --- |
|  |

| LOCATION OF CHURCH - City, Village or Township | LOCATION OF CHURCH - County |
| --- | --- |
|  |  |

| DATE OF BAPTISM (Month / Day / Year) | NAME OF PASTOR |
| --- | --- |
|  |  |

3. If the Registrant was married in Wisconsin, complete the following:

| FULL BIRTH NAME OF SPOUSE (First / Middle / Surname) |
| --- |
|  |

| DATE OF MARRIAGE (Month / Day / Year) | COUNTY OF MARRIAGE |
| --- | --- |
|  |  |

4. If the Registrant has children born in Wisconsin, complete the following:

| FULL BIRTH NAME OF CHILD | DATE OF BIRTH (Month / Day / Year) | COUNTY OF BIRTH |
| --- | --- | --- |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

5. Our office has the ability to request verification of the information provided in your application for a Social Security Number (numident printout) directly from the Social Security Administration (SSA) without cost. The information provided in the numident printout might be acceptable documentary evidence of the facts of birth. If you would like to have our office request a numident printout from SSA for you, please provide your Social Security Number.

This information will only be used to process your request to file a Delayed Birth Registration. Providing your Social Security Number is not mandatory and failing to do so will not result in denial of your request.

| SOCIAL SECURITY NUMBER: |  |
| --- | --- |

| VITAL RECORDS OFFICE USE ONLY |
| --- |
| Request Classifier Number _____        Request Fee _____ |

DEPARTMENT OF HEALTH SERVICES
Division of Public Health
F-05006 (Rev. 11/09)

STATE OF WISCONSIN
Chapter 69.14, Wis. Stats.

## AFFIDAVIT OF PERSONAL KNOWLEDGE OF A BIRTH FOR DELAYED BIRTH REGISTRATION

**PENALITIES:** Any person who willfully and knowingly supplies false information in the preparation or amendment of a birth certificate is guilty of a Class I felony [a fine of not more than $10,000 or imprisonment of not more than three years and six months, or both, per Chapter 69.24(1), Wis. Stats.].

**Call (608) 267-0914 if you have questions regarding the completion of this form.**

THE PERSON COMPLETING THIS FORM (AFFIANT) MUST BE AT LEAST 10 YEARS OLDER THAN THE REGISTRANT AND MUST HAVE PERSONAL KNOWLEDGE OF THE FACTS OF THE REGISTRANT'S BIRTH.

**Type or print in BLACK INK.**
Do NOT use cross-outs, erasures, write-overs, correction tape, or correction fluid on this form. If a mistake is made, prepare another form.

### SECTION I - FACTS OF BIRTH

**1. BIRTH NAME OF SUBJECT**

| First | Middle | Birth Surname |
|---|---|---|
| | | |

**2. SEX**

☐ Male  ☐ Female

**3. DATE OF BIRTH**

| Month | Day | Year |
|---|---|---|
| | | |

**4. PLACE OF BIRTH** (Check either "Hospital" or "Home" and provide the appropriate information.)

| | Name of Facility | City, Village, or Township | County | State |
|---|---|---|---|---|
| ☐ Hospital | | | | |

| | Street Address | City, Village, or Township | County | State |
|---|---|---|---|---|
| ☐ Home | | | | |

**5. FATHER'S FULL BIRTH NAME**

| First | Middle | Birth Surname |
|---|---|---|
| | | |

**6. MOTHER'S FULL BIRTH NAME**

| First | Middle | Birth Surname |
|---|---|---|
| | | |

**7. I KNOW THIS INFORMATION IS CORRECT BECAUSE:**

### SECTION II - NOTARIZATION

I, the undersigned, under penalty of perjury, declare that I have personal knowledge of the facts of this birth and that the above information and statements are true and correct, to the best of my knowledge and belief.

**CERTIFICATION OF NOTARY PUBLIC**

NOTARY SEAL

Subscribed and sworn before me this _____ day

of _____, _____.
          Month                  Year

_____ , Notary
SIGNATURE - Notary

County of _____ State of _____

My commission expires _____ .
                              (Month / Day / Year)

NAME OF NOTARY - Typed or Printed

**AFFIANT INFORMATION**

_____
NAME OF AFFIANT - Typed or Printed

_____  _____
RELATIONSHIP TO SUBJECT    AFFIANT'S DATE OF BIRTH

_____
STREET ADDRESS

_____  _____  _____
CITY, VILLAGE OR TOWNSHIP   STATE    ZIP CODE

(_____) _____  _____
TELEPHONE NUMBER              DATE SIGNED

_____
SIGNATURE - Affiant

DEPARTMENT OF HEALTH AND FAMILY SERVICES
Division of Public Health
DPH 5019 (Rev. 04/05)

STATE OF WISCONSIN
Chapter 69.14, Wis. Stats.

## CERTIFICATION OF BIRTH FACTS FOR DELAYED REGISTRATION
### PHYSICIAN, HOSPITAL, SCHOOL, CENSUS, CLINIC, NURSERY, ETC.

PENALITIES: Any person who willfully and knowingly supplies false information in the preparation of a birth certificate is guilty of a Class I felony [a fine of not more than $10,000 or imprisonment of not more than three years and six months, or both, per Chapter 69.24(1), Wis. Stats.].

Call (608) 267-0914 if you have questions regarding the completion of this form.

| THIS FORM MUST BE COMPLETED BY THE RECORD CUSTODIAN WHERE THE ORIGINAL RECORD IS ON FILE. |
| --- |

Type or print in BLACK INK.
Do **NOT** use cross-outs, write-overs, erasures, correction tape, or correction fluid. If a mistake is made, prepare another form.

### SECTION I - FACILITY INFORMATION

The information entered on this form is from the original record maintained by _____

**1. NAME OF FACILITY**


**2. LOCATION OF FACILITY**

| City, Village, or Township | County | State |
| --- | --- | --- |
| | | |

### SECTION II - INFORMATION FROM THE ORIGINAL RECORD  (Please enter "Not Stated" for any item not shown on the record.)

I certify that the following entries are exactly as they appear in the original record in my custody.

**1. NAME OF SUBJECT**

| First | Middle | Birth Surname |
| --- | --- | --- |
| | | |

**2. DATE OF BIRTH** / **3. PLACE OF BIRTH**

| Month | Day | Year | City, Village, or Township | County | State |
| --- | --- | --- | --- | --- | --- |
| | | | | | |

**4. FATHER'S FULL BIRTH NAME**

| First | Middle | Birth Surname |
| --- | --- | --- |
| | | |

**5. MOTHER'S FULL BIRTH NAME**

| First | Middle | Birth Surname |
| --- | --- | --- |
| | | |

**6. SEX** / **7. DATE OF ENTRY ON RECORD** / **8. TYPE OF RECORD**

| 6. SEX | Month | Day | Year | 8. TYPE OF RECORD |
| --- | --- | --- | --- | --- |
| ☐ Male  ☐ Female | | | | |

### SECTION III - NOTARIZATION

I, the undersigned, under penalty of perjury, declare that the above information and statements are true and correct, to the best of my knowledge and belief, and are supported by the information contained in the original record.

**CERTIFICATION OF NOTARY PUBLIC**

NOTARY SEAL

Subscribed and sworn before me this _____ day

of _____, _____
　　　　　Month　　　　　Year

_____ , Notary
SIGNATURE - Notary Public

County of _____ State of _____

My commission expires _____ .
　　　　　　　　　　　　(Month / Day / Year)

NAME OF NOTARY - Typed or Printed

**RECORD CUSTODIAN**

_____
NAME - Typed or Printed

_____
STREET ADDRESS OF FACILITY

_____
CITY, VILLAGE OR TOWNSHIP　STATE　ZIP CODE

( _____ ) _____   _____
TELEPHONE NUMBER　　　　DATE SIGNED

_____
SIGNATURE - Record Custodian

Nos. 14-2058 & 14-2059

DEPARTMENT OF HEALTH AND FAMILY SERVICES                                          STATE OF WISCONSIN
Division of Public Health                                                          Chapter 69.14, Wis. Stats.
DPH 5019 (Rev. 04/05)

## CERTIFICATION OF BIRTH FACTS FOR DELAYED REGISTRATION
### PHYSICIAN, HOSPITAL, SCHOOL, CENSUS, CLINIC, NURSERY, ETC.

PENALITIES: Any person who willfully and knowingly supplies false information in the preparation of a birth certificate is guilty of a Class I felony [a fine of
not more than $10,000 or imprisonment of not more than three years and six months, or both, per Chapter 69.24(1), Wis. Stats.].

**Call (608) 267-0914 if you have questions regarding the completion of this form.**

| THIS FORM MUST BE COMPLETED BY THE RECORD CUSTODIAN WHERE THE ORIGINAL RECORD IS ON FILE. |
|---|

**Type or print in BLACK INK.**
Do **NOT** use cross-outs, write-overs, erasures, correction tape, or correction fluid. If a mistake is made, prepare another form.

### SECTION I - FACILITY INFORMATION
The information entered on this form is from the original record maintained by _____

**1. NAME OF FACILITY**

**2. LOCATION OF FACILITY**

| City, Village, or Township | County | State |
|---|---|---|

### SECTION II - INFORMATION FROM THE ORIGINAL RECORD  (Please enter "Not Stated" for any item not shown on the record.)
I certify that the following entries are exactly as they appear in the original record in my custody.

**1. NAME OF SUBJECT**

| First | Middle | Birth Surname |
|---|---|---|

**2. DATE OF BIRTH** | **3. PLACE OF BIRTH**

| Month | Day | Year | City, Village, or Township | County | State |
|---|---|---|---|---|---|

**4. FATHER'S FULL BIRTH NAME**

| First | Middle | Birth Surname |
|---|---|---|

**5. MOTHER'S FULL BIRTH NAME**

| First | Middle | Birth Surname |
|---|---|---|

**6. SEX** | **7. DATE OF ENTRY ON RECORD** | **8. TYPE OF RECORD**

| | Month | Day | Year | |
|---|---|---|---|---|
| ☐ Male  ☐ Female | | | | |

### SECTION III - NOTARIZATION
I, the undersigned, under penalty of perjury, declare that the above information and statements are true and correct, to the best of my
knowledge and belief, and are supported by the information contained in the original record.

| CERTIFICATION OF NOTARY PUBLIC | RECORD CUSTODIAN |
|---|---|
| NOTARY SEAL<br><br>Subscribed and sworn before me this _____ day<br><br>of _____, _____<br>   Month      Year<br><br>_____, Notary<br>SIGNATURE - Notary Public<br><br>County of _____ State of _____<br><br>My commission expires _____<br>   (Month / Day / Year) | NAME - Typed or Printed<br><br>STREET ADDRESS OF FACILITY<br><br>CITY, VILLAGE OR TOWNSHIP  STATE  ZIP CODE<br><br>( ) _____<br>TELEPHONE NUMBER  DATE SIGNED |
| NAME OF NOTARY - Typed or Printed | SIGNATURE - Record Custodian |

DEPARTMENT OF HEALTH AND FAMILY SERVICES
Division of Public Health
DPH 5018 (Rev. 04/05)

STATE OF WISCONSIN
Chapter 69.14, Wis. Stats.

## CERTIFICATION OF BIRTH FACTS FOR DELAYED REGISTRATION
## BAPTISMAL RECORD

PENALITIES: Any person who willfully and knowingly supplies false information in the preparation of a birth certificate is guilty of a Class I felony [a fine of not more than $10,000 or imprisonment of not more than three years and six months, or both, per Chapter 69.24(1), Wis. Stats..

Call (608) 267-0914 if you have questions regarding the completion of this form.

THIS FORM MUST BE COMPLETED BY THE PRESENT PASTOR OF THE CHURCH WHERE THE BAPTISM OCCURRED.

Type or print in **BLACK INK.**
Do **NOT** use cross-outs, write-overs, erasures, correction tape, or correction fluid.

### SECTION I - CHURCH INFORMATION

The information entered on this form is from the original baptismal record maintained by

| 1. NAME OF CHURCH |
|---|
| |

| 2. LOCATION OF CHURCH | | |
|---|---|---|
| City, Village or Township | County | State |

### SECTION II - BAPTISMAL INFORMATION   (Please enter "Not Stated" for any item not shown on the record.)

I certify that the following entries are exactly as they appear in the baptismal register of this church.

| 1. NAME OF SUBJECT | | |
|---|---|---|
| First | Middle | Birth Surname |

| 2. DATE OF BIRTH | | | 3. PLACE OF BIRTH | | |
|---|---|---|---|---|---|
| Month | Day | Year | City, Village, or Township | County | State |

| 4. FATHER'S FULL BIRTH NAME | | |
|---|---|---|
| First | Middle | Birth Surname |

| 5. MOTHER'S FULL BIRTH NAME | | |
|---|---|---|
| First | Middle | Birth Surname |

| 6. SEX | 7. DATE OF BAPTISM | | | 8. NAME OF PASTOR AT TIME OF BAPTISM |
|---|---|---|---|---|
| ☐ Male  ☐ Female | Month | Day | Year | |

### SECTION III - NOTARIZATION

I, the undersigned, under penalty of perjury, declare that the above information and statements are true and correct, to the best of my knowledge and belief, and are supported by the records maintained by the church.

| CERTIFICATION OF NOTARY PUBLIC | PRESENT PASTOR |
|---|---|
| NOTARY SEAL  Subscribed and sworn before me this _____ day of _____, _____.  (Month) (Year)  _____, Notary  **SIGNATURE** - Notary  County of _____ State of _____  My commission expires _____.  (Month / Day / Year) | NAME - Typed or Printed  STREET ADDRESS OF CHURCH  CITY, VILLAGE OR TOWNSHIP   STATE   ZIP CODE  (_____)_____   _____  TELEPHONE NUMBER   DATE SIGNED |

_____
NAME OF NOTARY - Typed or Printed

SIGNATURE - Present Pastor

FORM **BC-600**
(9-14-2011)

U.S. DEPARTMENT OF COMMERCE
Economics and Statistics Administration
U.S. CENSUS BUREAU

# APPLICATION FOR SEARCH OF CENSUS RECORDS

## IMPORTANT INFORMATION
## PLEASE READ AND FOLLOW CAREFULLY



This application is for use in requesting a search of census records. *
Copies of these census records often are accepted as evidence of age,
citizenship, and place of birth for employment, social security benefits,
insurance, and other purposes.

If the applicant is located, an official transcript will be provided
including the following information:

| Personal Census Information | Available for census year(s) |
|---|---|
| • Census year | 1910–2000 |
| • County where taken | 1910–1980 |
| • State where taken | 1910–2000 |
| • Name | 1910–2000 |
| • Relationship to head of household | 1910–2000 |
| • Name of person in whose household you were counted | 1910–2000 |
| • Age at the time of the census | 1910–1950, 1970–2000 |
| • Date of birth |  |
|   Year and quarter | 1960 |
|   Month and year | 1970–1980 |
|   Year | 1990 |
|   Month/day/year | 2000 |
| • Place of birth | 1910–1950 |
| • Citizenship if requested or if foreign born | 1910–1950 |
| • Occupation (if requested) |  |

The U.S. Census Bureau's records are arranged according to the
address at the time of the census. Censuses are taken primarily for
statistical, not legal, purposes. Attention is called to the possibility that
the information shown in the census record may not agree with that
given in your application. **The record must be copied exactly as it
appears on the census form. The** U.S. Census Bureau CANNOT
make changes even though it realizes that enumerators may have been
misinformed or made mistakes in writing down the data they collected.
Those agencies that accept census transcripts as evidence of age,
relationship, or place of birth usually overlook minor spelling
differences but would be reluctant to consider a record that was
changed years later at an applicant's request.

If you authorize the U.S. Census Bureau to send your record to
someone other than yourself, you must provide the name and address,
including ZIP Code, of the other person/agency.

Birth certificates, including delayed birth certificates, are **not issued** by
the U.S. Census Bureau. You can obtain the birth certificate from the
Health Department or the Department of Vital Statistics of the state in
which the applicant was born.

The average time it should take you to fill out the BC-600, "Application for Search of Census
Records", including the time spent reading instructions is 12 minutes.

Send comments regarding this burden estimate or any other aspect of this collection of
information, including suggestions for reducing this burden, to: Paperwork Project
0607–0117, U.S. Census Bureau, 4600 Silver Hill Road, AMSD-3K138, Washington, D.C.
20233-1500. You may e-mail comments to Paperwork@census.gov; use "Paperwork Project
0607-0117" as the subject.

Respondents are not required to respond to any information collection unless it displays a
valid approval number from the Office of Management and Budget. This 8-digit number
appears in the top right corner of page 3 of this form.

* Information from 1930 and earlier censuses is public information and is available from the National Archives.

**The completed application should be mailed to the U.S. Census Bureau, P.O. Box 1545, Jeffersonville, IN 47131, together with a
money order or check payable to "Commerce–Census."**

## INSTRUCTIONS FOR COMPLETING THIS FORM
## PRINT OR TYPE INFORMATION EXCEPT SIGNATURE
## PLEASE FOLLOW NUMBERED INSTRUCTIONS

### 1. Purpose

The purpose for which the information is desired must be shown so that a determination may be made under 13 U.S.C. 8(a) that the record is required for proper use. For proof of age, most agencies require documents closest to date of birth; therefore we suggest you complete information for the EARLIEST CENSUS AFTER DATE OF BIRTH.

### 2. Signature

Each application requires a signature. The signature should be the same as that shown on the line captioned "full name of person whose census record is requested." When the application is for a census record concerning another person, the requester must sign the application, and the authority of the requester must be furnished as stated in instruction 3 below. If signed by marking (X), please indicate the name of the person whose mark it is and have witnesses sign as instructed. IF SIGNATURE IS PRINTED, please indicate that is the usual signature.

### 3. Confidential information given to other than person to whom it relates

(a) Census information is confidential and ordinarily will not be furnished to another person unless the person to whom it relates authorizes this in the space provided or if there is other proper authorization as indicated in 3(b), 3(c), and 3(d).

(b) Minor children – Information regarding a child who has at this time not reached the legal age of 18 may be obtained upon the written request of either parent or guardian.

(c) Mentally incompetent persons – Information regarding persons who are mentally incompetent may be obtained upon the written request of the legal representative, supported by a certified copy of the court order naming such legal representative.

(d) Deceased persons – If the record requested relates to a deceased person, the application MUST be signed by (1) a blood relative in the immediate family (parent, brother, sister, or child), (2) the surviving wife or husband, (3) the administrator or executor of the estate, or (4) a beneficiary by will, or insurance. IN ALL CASES INVOLVING DECEASED PERSONS, a certified copy of the death certificate MUST be furnished, and the relationship to the deceased MUST be stated on the application. Legal representatives MUST also furnish a certified copy of the court order naming such legal representatives; and beneficiaries MUST furnish legal evidence of such beneficiary interest.

### 4. Fee required

The $65.00 fee is for a search of one census for one person only. The time required to complete a search depends upon the number of cases on hand at the particular time and the difficulty encountered in searching a particular case. The normal processing time is 3 to 4 weeks. The fee covers return postage of your search results by regular mail. You do not need to include a return envelope for normal processing. For an additional fee of $20 the search can be completed in one business day after we receive it. If you want your search results returned to you by express mail you must include a self-addressed, prepaid express mail envelope with your application. You may also submit your application by express mail for faster service.

No more than one census will be searched and the results furnished for one fee. Should it be necessary to search more than one census to find the record, you will be notified to send another fee before another search is made. Tax monies are not available to furnish the information. **If a search has been made, the fee cannot be returned even if the information is not found.**

### 5. Full schedules

The full schedule is the complete one-line entry of personal data recorded for that individual ONLY. The names of other persons will not be listed. If the applicant specifies "full schedule," the Census Bureau will furnish, in addition to the regular transcript, whatever other information appears on the named person's record in the original schedule, but only for THAT PERSON. In this case the information is typed on a facsimile of the original census schedule and verified as a true copy. There is an additional charge of $10.00 for EACH full schedule requested.

The Census Bureau also will provide "full schedule" information for those other members of the same household for whom authorizations are furnished. (See Instruction 3 for authorization requirements). A fee of $10.00 is required for each person listed on the full schedule.

**LIMITATIONS** – Certain information, such as place of birth, citizenship, and occupation, is available only for census years 1910 through 1950. Full schedule information is not available for census years 1970, 1980, 1990, and 2000.

### 6. Census years 1910–1920–1930–1940– 1950–1960–1970–1980–1990–2000

The potential of finding an individual's census record is increased when the respondent provides thorough and accurate address information FOR THE DAY THESE CENSUSES WERE TAKEN. If residing in a city AT THE TIME THESE CENSUSES WERE TAKEN, it is necessary to furnish the house number, the name of the street, city, county, state, and the name of the parent or other head of household with whom residing at the time of the census. If residing in a rural area, it is VERY IMPORTANT to furnish the township, district, precinct or beat, AND the direction and number of miles from the nearest town.

**1990 and 2000 Request** – It is VERY IMPORTANT to provide a house number and street name or rural route and box number. Always include a ZIP Code.

### 7. Locator Map (optional)

Box 7 is provided for a sketch of the area where the applicant lived at the time of the requested census.

**IF YOU NEED HELP FILLING OUT THIS APPLICATION, PLEASE CALL 812–218–3046, MONDAY THROUGH FRIDAY 7:00 A.M. THROUGH 4:30 P.M. EASTERN TIME**

FORM BC-600 (9-14-2011)

DETACH HERE

DO NOT RETURN WITH APPLICATION

DETACH HERE

FORM BC-600
(9-14-2011)

U.S. DEPARTMENT OF COMMERCE
Economics and Statistics Administration
U.S. CENSUS BUREAU

OMB No. 0607-0117

## APPLICATION FOR SEARCH OF CENSUS RECORDS

RETURN TO: U.S. Census Bureau, P.O. Box 1545, Jeffersonville, IN 47131

**DO NOT USE THIS SPACE – OFFICIAL USE ONLY**

Case number

NAME OF APPLICANT ▶

$ _____ (Fee)

☐ Money Order
☐ Check
☐ Other

Papers received (itemize)

Returned

**1. Purpose for which record is to be used** (See Instruction 1)

☐ Passport (date required) _____
☐ Genealogy
☐ Proof of age
☐ Other – Please specify

I certify that information furnished about anyone other than the applicant will not be used to the detriment of such person or persons by me or by anyone else with my permission.

**2. Signature** – Do not print (Read Instruction 2 carefully before signing)

Received by | Date | Returned by | Date

Signature

IF SIGNED BY MARK (X), TWO WITNESSES MUST SIGN HERE

Signature | Signature

Telephone number (include area code)

PRESENT MAILING ADDRESS

Number and street

City | State | ZIP Code

**3. If the census information is to be sent to someone other than the person whose record is requested,** give the name and address, including ZIP Code, of the other person or agency.

This authorizes the U.S. Census Bureau to send the record to: (See instruction 3)

**4.** A check or money order (**DO NOT SEND CASH**) payable to "Commerce – Census" must be sent with the application. This fee covers the cost of a search of no more than one census year for one person only.

FEE REQUIRED: (See instructions 4 and 5)

**5. Fee required** . . . . . . . . . . . . . . . $ 65.00
_____ extra copies @ $2.00 $ _____
_____ full schedules @ $10.00 $ _____
_____ expedited fee @ $20.00 $ _____
**TOTAL amount enclosed** $ _____

NOTICE – Intentionally falsifying this application may result in a fine of $10,000 or 5 years of imprisonment, or both (title 18, U.S. Code, section 1001).

FULL NAME OF PERSON WHOSE CENSUS RECORD IS REQUESTED ▶

First name | Middle name | Maiden name (If any) | Present last name | Nicknames

Date of birth (If unknown, estimate) | Place of birth (City, county, State) | Race | Sex | Nicknames

Full name of father (Stepfather, guardian, etc.)

Full maiden name of mother (Stepmother, etc.)

First marriage (Name of husband or wife of applicant) | Year married (Approximate) | Second marriage (Name of husband or wife of applicant) | Year married (Approximate)

Names of brothers and sisters

Name and relationship of all other persons living in household (Aunts, uncles, grandparents, lodgers, etc.)

PLEASE COMPLETE REVERSE SIDE

FORM BC-600 (9-14-2011)

**6.**

## GIVE PLACE OF RESIDENCE FOR APPROPRIATE CENSUS DATE (SEE INSTRUCTIONS 1 AND 6)

| Census date | Number and street (Read instruction 6 first) | City, town, township (Read instruction 6 first) | County and State | Name of person with whom living (Head of household) | Relationship of head of household |
|---|---|---|---|---|---|
| April 15, 1910 (See instruction 6) | | | | | |
| Jan. 1, 1920 (See instruction 6) | | | | | |
| April 1, 1930 (See instruction 6) | | | | | |
| April 1, 1940 (See instruction 6) | | | | | |
| April 1, 1950 (See instruction 6) | | | | | |
| April 1, 1960 (See instruction 6) | | | | | |
| April 1, 1970 (See instruction 6) | | | | | |
| April 1, 1980 (See instruction 6) | | | | | |
| April 1, 1990 (See instruction 6) | ZIP Code | | | | |
| April 1, 2000 (See instruction 6) | ZIP Code | | | | |

**7. LOCATOR MAP** (Optional)
PLEASE DRAW A MAP OF WHERE THE APPLICANT LIVED, SHOWING ANY PHYSICAL FEATURES, LANDMARKS, INTERSECTING ROADS, CLOSEST TOWNS, ETC., THAT MAY AID IN LOCATING THE APPLICANT FOR THE CENSUS YEAR REQUESTED.

*HAVE YOU SIGNED THE APPLICATION AND ENCLOSED THE CORRECT FEES?*